# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

TIMOTHY H. MEYERS, Securityholder Representative, solely in his capacity as representative of the former Embody, Inc. Securityholders,

Plaintiff,

v.

ZIMMER BIOMET HOLDINGS, INC. and EMBODY, INC.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2025-0732-BWD

## MEMORANDUM OPINION RESOLVING MOTION TO DISMISS

Date Submitted: April 1, 2026
Date Decided: May 1, 2026

Patricia L. Enerio and Brendan Patrick McDonnell, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE; OF COUNSEL: James D. Herschlein, Angela R. Vicari, Rebecca Zoller, ARNOLD & PORTER KAYE SCHOLER LLP, New York, NY; *Attorneys for Plaintiff Timothy H. Meyers*.

Jody C. Barillare, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, DE; OF COUNSEL: Troy S. Brown, Su Jin Kim, Shawn F. Summers, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, PA; *Attorneys for Defendants Zimmer Biomet Holdings, Inc. and Embody, Inc.*

**DAVID, V.C.**

The plaintiff in this action, the designated securityholder representative under a merger agreement, seeks to recover earnout consideration and other damages under theories of fraud, breach of a contractual obligation to use commercially reasonable efforts to achieve earnout milestones, and breach of the implied covenant of good faith and fair dealing.

Embody, Inc. ("Embody") was a Virginia corporation developing medical devices to treat soft tissue injuries. Zimmer Biomet Holdings, Inc. ("Zimmer") proposed to acquire Embody. As alleged in the complaint, Zimmer represented in negotiations that it was hiring, and had budget approval to hire, 94 sports medicine sales representatives over the next two years, positioning Embody to become the centerpiece of its expanding sports medicine business. Zimmer allegedly also represented to Embody that it would be "comfortable" implementing Embody's existing plans to develop its products. According to the plaintiff, however, Zimmer never intended to hire 94 sales representatives and did not have budget approval to do so, nor would it follow Embody's plans for product development.

The parties negotiated a merger agreement under which Zimmer acquired Embody for an initial cash payment of $155 million plus possible earnout payments over a three-year period. The merger agreement obligated the surviving entity in the merger to use commercially reasonable efforts to achieve the earnout milestones but otherwise afforded it discretion to direct and control the production, marketing,

1

promotion, sale, and commercialization of the acquired company's products. After closing, the surviving entity partially achieved the earnout milestones, entitling Embody securityholders to approximately $72.5 million out of a potential $120 million in earnout payments.

For reasons explained below, the plaintiff's complaint fails to state a claim for fraud, with one exception. The complaint also fails to state claims for breach of the commercially reasonable efforts provision or the implied covenant of good faith and fair dealing in the merger agreement.

## I.      BACKGROUND[1]

### A.      Zimmer And Embody Consider A Potential Transaction.

In 2014, nonparty Jeff Conroy founded Embody, a Virginia corporation, to develop medical device products using collagen-based biofabrication techniques to support healing of soft tissue injuries. Am. Compl. ¶ 26. Embody makes three products: TAPESTRY® ("Tapestry"), a microfibrous bioengineered implant used for tendon and ligament repair; TAPESTRY® RC ("Tapestry RC"), an arthroscopic instrumented delivery and fixation system designed for rotator cuff tear repair; and

---

[1] The following facts are taken from the Amended Verified Complaint (the "Amended Complaint") and the documents incorporated by reference therein. Am. Verified Compl. [hereinafter Am. Compl.], Dkt. 17. The transcript of the April 1, 2026 oral argument is cited as "Tr." Dkt. 40.

2

ACTIVBRAID® ("Activbraid"), a suture made from a high-strength collagen braided together with an ultra-high molecular-weight polyethylene. *Id.* ¶¶ 30–32.

Embody achieved clearance through the Food and Drug Administration's ("FDA") 510(k) premarket notification pathway for Tapestry, Tapestry RC, and Activbraid on October 19, 2020, May 31, 2022, and June 2, 2023, respectively. *Id.* To market and sell its products, Embody established a system of distributors and engaged eight direct sales representatives and managers to teach physicians, medical practices, and hospitals how to use its products. *Id.* ¶¶ 35, 37.

Zimmer is a global medical device company. *Id.* ¶ 1. At a trade show in the summer of 2022, Zimmer's Global Vice President and General Manager, Extremities & Sports Medicine, Kristoff Goson, visited Embody's booth to learn more about its products. *Id.* ¶ 47. Goson later approached Embody about a potential transaction in which Zimmer would acquire Embody. *Id.* ¶ 48.

In September 2022, Embody and Zimmer met at an orthopedic conference in Boston. *Id.* ¶ 50. At the meeting, with teams from Embody, its advisor Guggenheim Partners, and Zimmer present, "Goson described [Zimmer's] business, including the sports medicine business that Zimmer [] was building into the best in the industry." *Id.* ¶¶ 49, 52. Goson represented that "Zimmer [] was hiring, and already had budget approval to hire, 94 direct sports medicine sales representatives over the next two years." *Id.* ¶ 52. Goson explained that "the hires were not dependent on an

acquisition of [] Embody and were part of [Zimmer's] broader plan to expand its sports medicine business." *Id.*

"Goson continued to emphasize that the 94 direct sports medicine sales representatives would drive massive success and that Zimmer [] had already started the process for hiring representatives." *Id.* "During the diligence meetings, [] Embody told Zimmer [] how important it was to them that they increased sales of the Embody [p]roducts, which they believed could primarily be done through the use of an increased number of sales representatives." *Id.* ¶ 53. "Goson . . . represented that the Embody [p]roducts would be the centerpiece of [Zimmer's] expanding sports medicine business." *Id.* ¶ 55.

On October 26 and 27, 2022, Zimmer and Embody met in Norfolk, Virginia. *Id.* ¶ 56. "Throughout due diligence, including during [that] meeting, Zimmer [] spent hundreds of hours investigating [Tapestry RC], the majority of which was spent learning about the changes and updates that [] Embody had planned for it, including improvements such as changes to the introducer and scale, since it was a first-generation product." *Id.* "Embody's onward-looking plan included taking the current version of [Tapestry RC] and developing it into an improved version two and then a version three, which could be mass produced." *Id.* "In or about November 2022, Goson stated that Zimmer [] was 'comfortable' with [] Embody's plans for versions two and three, that [] Embody's model was 'acceptable,' that Zimmer

4

[] would make the changes work, and that Zimmer [] was working on multiple ways of accelerating the work to achieve version three more quickly." *Id.* ¶ 57. "Goson also stated that he would take the 'whole deal,' which included the version changes to [Tapestry RC], to the [Zimmer Board] for final approval." *Id.*

"Goson repeated his representations about the 94 new direct sports medicine sales representative hires throughout the diligence process, including at the September and October 2022 meetings." *Id.* ¶ 59. Embody believed additional "sports medicine sales representatives would give the company tighter control over priorities and strategy, compared with using distributors and/or a hybrid of sales representatives and distributors to sell products." *Id.*

## B. Zimmer And Embody Enter Into A Merger Agreement.

On December 22, Zimmer, Embody, and Timothy H. Meyers ("Plaintiff"), in his capacity as the "Securityholder Representative" for Embody securityholders (the "Securityholders"), entered into a merger agreement (the "Merger Agreement") under which Zimmer agreed to acquire Embody in a merger (the "Merger") for an initial cash payment of $155 million plus possible earnout payments. *Id.* ¶ 66; Defs.' Opening Br. in Supp. of Their Mot. to Dismiss, Ex. A [hereinafter Agt.], Dkt. 25.

Section 2.10(a) of the Merger Agreement requires the surviving entity in the Merger ("New Embody," and with Zimmer, "Defendants") to pay the

5

Securityholders additional consideration if certain milestones are achieved during a three-year earnout period ending December 31, 2025:

> Milestone Payments. As additional consideration for the transactions contemplated by this Agreement (the "Additional Consideration"), the Surviving Entity shall, subject to the terms and conditions of this Agreement, upon the achievement of the milestones set forth below (each a "Milestone"), pay or cause to be paid to each Securityholder their respective Pro Rata Share of the Milestone Payment Amount set forth below with respect to each such Milestone (each payment achieved pursuant to this Section 2.10, a "Milestone Payment" and together, the "Milestone Payments"), in each case less the amount of (i) any set-off permitted pursuant to Section 2.08(f)(ii) for amounts payable to Parent by the Company, the Securityholder Representative, or any Securityholder thereunder and (ii) the amount of any fees due and payable to Guggenheim Securities with respect to such achieved Milestone Payment:

| # | Milestone | Milestone Payment Amount ($) |
|---|---|---|
| (i) | FDA Approval | $15,000,000 |
| (ii) | $11,400,000 of Net Sales during the period from the Closing Date through December 31, 2023 | $30,000,000 |
| (iii) | $28,000,000 of Net Sales during the 12-month period ended December 31, 2024 | $35,000,000 |
| (iv) | $45,000,000 of Net Sales during the 12-month period ended December 31, 2025 | $40,000,000 |

*Id.* § 2.10(a).[2] Under Section 2.10(c), if New Embody does not achieve a Milestone in full but achieves at least 80% of the Milestone, the Securityholders are entitled to a partial Milestone Payment. *Id.* § 2.10(c).

---

[2] "FDA Approval" refers to FDA 510(k) clearance of Activbraid. Am. Compl. ¶¶ 66, 110.

Section 2.10(h) of the Merger Agreement requires New Embody to use commercially reasonable efforts to achieve the Milestones:

Surviving Entity Obligations. ***The Surviving Entity shall use commercially reasonable efforts to achieve the Milestones.*** For the avoidance of doubt, if the Surviving Entity fails to achieve any Milestone, such failure shall not by itself constitute a failure by the Surviving Entity to use, commercially reasonable efforts to achieve the Milestones. ***The Surviving Entity and its Affiliates shall have the right, in their sole discretion, to direct and control the production, marketing, promotion, sale and commercialization of the Company Product in all respects.*** Nothing in this Agreement shall be construed to impose any express or implied obligation, duty or expectation to test, develop, make regulatory filings, obtain regulatory approvals, produce, commercialize or otherwise advance any version of the Company Products. Parent and its Affiliates (including, after the Closing, the Surviving Entity) make no representation or warranty, either express or implied, that they will be able to successfully achieve any Milestone. The Company, the Securityholder Representative and the Securityholders each acknowledge and agree that Parent and its Affiliates have, and will continue to have, other products and programs that may compete for resources that may be expended in the pursuit of achievement of the Milestones. Nothing in this Agreement shall limit or restrict the right of Parent or its Affiliates (including, after the Closing, the Surviving Entity) to test, develop, make regulatory filings, obtain regulatory approvals, produce, commercialize or otherwise advance, any product that is not the Company Products or to suspend or discontinue the pursuit of achievement of the Milestones. For the avoidance of doubt, this Section 2.10(h) shall be the only covenant, agreement or obligation of Parent or its Affiliates with respect to the level of efforts or resources to be expended in the research, development, sale or commercialization of Company Products after the Closing.

*Id.* § 2.10(h) (emphasis added).

7

## C. Zimmer's Post-Merger Efforts To Achieve The Milestones

The Merger closed on February 14, 2023. Am. Compl. ¶ 73. Within months, Conroy began to raise concerns with Goson about Zimmer's "delays in critical hirings and Defendants' failure to implement promised efforts to advance sales," including by failing to hire 94 new sports medicine sales representatives. *Id.* ¶¶ 77, 80.

"Throughout 2023, many of the [] Embody senior executives left Zimmer" and their "positions were either not filled, or were filled much later with more junior people than the position required." *Id.* ¶ 78. Zimmer also placed one of Embody's preexisting clinical studies "on hold" while another was terminated. Am. Compl. ¶¶ 88–90.

## D. Zimmer Makes Milestone Payments.

After Activbraid received FDA Approval on June 2, Zimmer paid the Securityholders an initial Milestone Payment of $15 million. *See id.* ¶ 110. Zimmer paid the Securityholders a second Milestone Payment of $25,573,876 out of a potential $30 million (an alleged $4,426,124 shortfall), and Zimmer paid the Securityholders a third Milestone Payment of $31,990,089 out of a potential $35 million (an alleged $3,009,911 shortfall). *Id.* ¶¶ 111–12. New Embody failed to achieve the final Milestone or to reach the 80% threshold required for a partial payment, such that the Securityholders did not receive a fourth and final Milestone

8

Payment for 2025.  Pl.'s Jan. 15, 2026 Ltr. to the Ct. at 2, Dkt. 33.  In total, Zimmer paid the Securityholders $72,563,965 out of a potential $120 million in Milestone Payments.  Am. Compl. ¶¶ 110–12; *see* Agt. § 2.10(a).

### E.    Procedural History

On June 27, 2025, Plaintiff initiated this action through the filing of a Verified Complaint.  Verified Compl., Dkt. 1.  Plaintiff filed the operative Amended Complaint on September 5.  Am. Compl., Dkt. 17.  The Amended Complaint alleges three causes of action.  The First Cause of Action alleges that Zimmer committed fraud by making material misrepresentations to induce Embody to enter into the Merger Agreement.  *Id.* ¶¶ 121–27.  The Second Cause of Action alleges that New Embody breached Section 2.10(h) of the Merger Agreement by failing to use "commercially reasonable efforts to achieve the Milestones."  *Id.* ¶¶ 128–34.  The Third Cause of Action alleges that Zimmer and New Embody breached the implied covenant of good faith and fair dealing in the Merger Agreement.  *Id.* ¶¶ 135–44.

On September 30, Defendants moved to dismiss the Amended Complaint (the "Motion to Dismiss") and filed their opening brief in support thereof.  Defs.' Opening Br. in Supp. of Their Mot. to Dismiss [hereinafter OB], Dkt. 25.  On November 6, Plaintiff filed his answering brief in opposition to the Motion to Dismiss.  Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss [hereinafter AB], Dkt. 28.  Defendants filed their reply brief in further support of the Motion to

Dismiss on December 4.  Defs.' Reply Br. in Supp. of Their Mot. to Dismiss the Am. Compl. [hereinafter RB], Dkt. 30.  The Court heard oral argument on the Motion to Dismiss on April 1, 2026.

## II.   ANALYSIS

Defendants have moved to dismiss the Amended Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim.  When reviewing a motion to dismiss under Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party."  *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

The Amended Complaint alleges claims for fraud, breach of New Embody's contractual obligation to use commercially reasonable efforts to achieve the Milestones, and breach of the implied covenant of good faith and fair dealing. Taking the claims in order, I conclude that one aspect of Plaintiff's fraud claim survives.  The Amended Complaint fails to state a claim for breach of contract or the implied covenant of good faith and fair dealing; those claims are dismissed in their entirety.

10

### A. The Amended Complaint States A Claim For Fraud.

The First Cause of Action alleges that Zimmer committed fraud by inducing Embody to enter into the Merger Agreement based on false representations about its intnetions to hire additional sales representatives and to carry out Embody's preexisting plans.

A claim for fraud under Delaware law has five elements:

> (1) a false statement, generally of fact, made by the defendant; (2) the defendant's knowledge or belief that the statement was false at the time it was made, or the defendant's reckless indifference to [the] statement's truth; (3) the defendant's intent to cause the plaintiff to act or refrain from acting as a result of the statement; (4) the plaintiff's justifiable reliance on that statement in acting or in refraining from acting; and (5) damages incurred as a result of that reliance.

*Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at \*23 (Del. Ch. Feb. 27, 2020) (footnote omitted). "Court of Chancery Rule 9(b) imposes a heightened pleading standard on plaintiffs asserting fraud claims." *Id.* at \*24. Rule 9(b) requires "a party [to] state with particularity the circumstances constituting fraud." Ct. Ch. R. 9(b). "Under Rule 9(b), the circumstances that must be stated with particularity are the time, place, and contents of the false representation, the identity of the person(s) making the representation, and what he intended to obtain thereby." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003). Though the circumstances of the fraud must be pled with particularity, "[i]t is not necessary

11

under Rule 9(b) to plead knowledge or intent with particularity[.]" *KnighTek, LLC v. Jive Commc'ns, Inc.*, 225 A.3d 343, 353 (Del. 2020).

Plaintiff's fraud claim is premised on two alleged misrepresentations. First, the Amended Complaint alleges that at a meeting in September 2022, Goson falsely represented that as "part of [Zimmer's] broader plan to expand its sports medicine business[,]" "Zimmer [] was hiring, and already had budget approval to hire, 94 direct sports medicine sales representatives over the next two years" (the "Hiring Representation"). Am. Compl. ¶¶ 50, 52. Plaintiff asserts that, in fact, "there was no approval to hire the promised sales representatives" and "only one of the 94 representatives was hired by September 2023." *Id.* ¶¶ 13, 80; AB at 18 (emphasis omitted). Second, Plaintiff alleges that in November 2022, Goson falsely "stated that Zimmer [] was 'comfortable' with [] Embody's plans" to "tak[e] the current version of [Tapestry RC] and develop[] it into an improved version two and then a version three[,]" and represented that Zimmer "would make the changes work" and "was working on multiple ways of accelerating the work to achieve version three more quickly" (the "Development Representation").[3] Am. Compl. ¶¶ 56–57.

---

[3] Plaintiff also asserts fraud based on alleged omissions, but Plaintiff merely restates the alleged affirmative misstatements as omissions. *See* AB at 25–26 ("At no time prior to closing did Zimmer [] communicate to [] Embody that [the Hiring Representation and Development Representation] were not true . . . . Given the extensive discussions related to the importance of these representations, [Zimmer's] omissions are actionable.").

Plaintiff alleges that Defendants did not follow through on this promise and "Zimmer [] and New Embody's development plan was not consistent with what the parties discussed during diligence." *Id.* ¶ 84.

Defendants argue that the Amended Complaint fails to adequately allege that Plaintiff reasonably relied on either the Hiring Representation or the Development Representation because those representations reflect future promises that contradict the Merger Agreement's integration clause. That is largely true. Although the Merger Agreement does not include anti-reliance language barring fraud claims, it contains the following integration clause:

> Entire Agreement. This Agreement (including the Disclosure Schedules and exhibits hereto) and the Confidentiality Agreement constitute the entire agreement of the parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, among the parties hereto with respect to the subject matter hereof and thereof.

Agt. § 11.05. "Our law is now settled that '[t]he presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims.'" *S'holder Rep. Servs. LLC v. Albertsons Cos., Inc.*, 2021 WL 2311455, at *12 (Del. Ch. June 7, 2021) (quoting *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004)). "While anti-reliance language is needed to stand as a contractual bar to an extra-contractual fraud claim based on factual

13

misrepresentations, an integration clause alone is sufficient to bar a fraud claim based on expressions of future intent or future promises." *Id.* at \*12 (footnote omitted); *see Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at \*24 (Del. Ch. Sep. 30, 2014) (dismissing fraud claim based on a future promise where the parties committed "in several clear integration clauses . . . that [they] would not rely on promises and agreements outside of those writings"). "Plaintiff does not dispute" that "a fraud claim cannot be based on promises of future conduct." AB at 24.

The Development Representation is based on a future promise rather than a statement of present fact, and Plaintiff therefore could not have reasonably relied on it in light of the integration clause. Again, the Amended Complaint alleges that through the Development Representation, Goson falsely represented that Zimmer was "comfortable" with Embody's existing plans to develop Tapestry RC, would "make [Embody's] changes work," and was "working on multiple ways" to achieve and accelerate Embody's plans. Am. Compl. ¶ 57. In essence, Plaintiff's allegation is that Zimmer promised to carry out Embody's existing plans to develop Tapestry RC but then followed its own plans instead. Importantly, the Merger Agreement does not obligate Zimmer to use Embody's plans to develop Tapestry RC; instead, it vests New Embody with the "discretion[] to direct and control the production, marketing, promotion, sale and commercialization of the Company Product in all

14

respects." Agt. § 2.10(h). Plaintiff's claim that Defendants breached a contrary promise is barred by the integration clause. Put differently, because "[t]he plain terms of the Merger Agreement contradict the alleged misrepresentations on which [Plaintiff] claims [he] relied[,]" his purported reliance on the Development Representation was not justifiable. *Albertsons*, 2021 WL 2311455, at \*12.

The same is true for most aspects of the Hiring Representation. Plaintiff alleges that through the Hiring Representation, Goson falsely represented that Zimmer "was hiring, and already had budget approval to hire, 94 direct sports medicine sales representatives over the next two years." Am. Compl. ¶ 52. In light of the integration clause, Plaintiff cannot premise a fraud claim on a promise to hire representatives in the future that the parties did not include in the Merger Agreement.[4] As Defendants point out, a statement that Zimmer "was hiring . . . representatives over the next two years" reflects Zimmer's promise to hire sales representatives in the future rather than a statement of present fact. OB at 15, RB at 6.

A representation that Zimmer "already had budget approval to hire" additional sales representatives is, however, a statement of present fact that can support a claim

---

[4] *See* AB at 18 (arguing that "Zimmer [] had 'no intention of performing' at the time the promise [w]as made" (citation omitted)).

15

for fraud.[5] The Amended Complaint supports a claim for fraud based on this alleged misrepresentation.[6] The Amended Complaint alleges that this representation was false, and in fact, Zimmer did not have budget approval to hire 94 new sales representatives. *See* Am. Compl. ¶ 122. To support an inference that this statement was false when made, the Amended Complaint alleges that immediately after the Merger closing, Zimmer implemented a hiring freeze, and by September 2023, Zimmer had hired just one additional sales representative. *Id.* ¶¶ 12, 80. Defendants argue that a hiring freeze implemented months after Goson's alleged statement does not show Zimmer lacked budget approval to hire additional sales representatives at the time Goson made the statement, and that the better inference to be drawn is that Zimmer modified its plans due to changes in the market. *See* OB at 15–16. That is certainly one possible inference, but at this stage, I must draw all reasonable inferences in Plaintiff's favor.

---

[5] I note that the Hiring Representation was allegedly made orally during meetings between the parties. Recollections may differ, and the record will confirm the nature of any oral representations made, including whether Goson's alleged promise to hire additional sales representatives did, in fact, include a factual representation about budget approval. At this stage, I must accept Plaintiff's formulation of the Hiring Representation as it is alleged in the Amended Complaint.

[6] Defendants argue that the Amended Complaint fails to satisfy Rule 9(b)'s particularity requirements by identifying "the time, place, and contents of the false representation, the identity of the person(s) making the representation, and what he intended to obtain thereby." *H-M Wexford*, 832 A.2d at 145. To the contrary, the Amended Complaint alleges that Goson made the Hiring Representation at the Wynn Hotel in Boston during an orthopedic conference held between September 21 and 24, 2022. Am. Compl. ¶¶ 50, 122.

The Amended Complaint adequately alleges that Goson conceivably knew his statement was false. As the Global Vice President and General Manager, Extremities & Sports Medicine at Zimmer, Goson inferably was in a "position to know" that Zimmer did not already have budget approval to hire 94 sales representatives. *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006). And the Amended Complaint supports an inference that Goson's statement was intended to induce Plaintiff to enter into the Merger Agreement, and that Plaintiff relied on the allegedly false representation. The Amended Complaint alleges that Zimmer touted its planned increase in sales representatives as a key component of its growing sports medicine business, and Embody believed that additional sales representatives would be important for improving marketing and growing a business that relied heavily on representatives to teach physicians how to use its products. Am. Compl. ¶¶ 9, 55, 59, 65. Plaintiff contends that Embody relied on the representation to its detriment and would have negotiated different Milestones, required a greater up-front payment, or would not have entered into the Merger Agreement if it knew Zimmer had not in fact budgeted for the new positions. *Id.* ¶¶ 58, 126. These allegations satisfy the remaining elements necessary to plead fraud.

As a result, the motion to dismiss the First Cause of Action is granted in part and denied in part.

17

### B. The Amended Complaint Fails To State A Claim For Breach Of The Commercially Reasonable Efforts Provision.

The Second Cause of Action alleges a claim against New Embody for breach of Section 2.10(h) of the Merger Agreement, which required New Embody to "use commercially reasonable efforts to achieve the Milestones."

"To [state] a breach of contract claim, a party must [allege]: (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages that the plaintiff suffered as a result of the breach." *Albertsons*, 2021 WL 2311455, at *6 (quoting *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *6 (Del. Ch. Nov. 19, 2013)).

Defendants do not dispute that the Merger Agreement is a binding contract or that the Amended Complaint pleads harm arising from the alleged breach.[7] Instead, they argue that Plaintiff has not alleged a breach of Section 2.10(h) as they interpret the language therein. "The principles of contract interpretation under Delaware law are well-established." *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021). "When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous

---

[7] Defendants initially argued that "Plaintiff's breach of contract claim . . . [wa]s unripe" because Plaintiff filed this litigation before the earnout period expired, but Defendants withdrew that argument by letter on January 14. OB at 27–29; Defs.' Jan. 14, 2026 Ltr. to the Ct., Dkt. 32 ("Defendants do not intend to rely on their ripeness argument in further litigating the Motion to Dismiss . . . .").

language." *Id.* "Contracts will be interpreted to 'give each provision and term effect' and not render any terms 'meaningless or illusory.'" *Id.* (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)). "Language is ambiguous if it is susceptible to more than one reasonable interpretation." *Id.* On a motion to dismiss, a "trial court cannot choose between two differing reasonable interpretations of ambiguous provisions." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003). If "the provisions at issue in [an agreement] are susceptible to more than one reasonable interpretation, for purposes of deciding a motion to dismiss, their meaning must be construed in the light most favorable to the non-moving party." *Id.*

Again, Section 2.10(h) states that New Embody "shall use commercially reasonable efforts to achieve the Milestones. . . . [New Embody] and its Affiliates shall have the right, in their sole discretion, to direct and control the production, marketing, promotion, sale and commercialization of the Company Product in all respects." Agt. § 2.10(h). Defendants interpret these sentences together to mean that New Embody's right to act in its sole discretion "qualifies what level of commercial[ly] reasonable efforts New Embody must use." Tr. at 16:14–16.[8]

---

[8] *See also id.* at 18:15–22 ("[Y]ou have very buyer-friendly language saying that essentially the buyers can do whatever they want, but they are obligated to act in good faith, but they

19

Defendants argue that "[f]or each of Plaintiff's allegations regarding [New Embody's] failure to use commercially reasonable efforts, the Merger Agreement expressly commits such matters to the 'sole discretion' of Defendants and disclaims any obligation to take specific actions."  OB at 31.  Because Plaintiff's allegations all concern the production, marketing, sale, or commercialization of New Embody's products, Defendants contend these allegations cannot support a breach of the commercially reasonable efforts obligation.  *Id.* at 32.

Plaintiff argues that Defendants have it backward and the commercially reasonable efforts obligation in Section 2.10(h) qualifies New Embody's discretion, not the other way around.  AB at 30–31.  Plaintiff cites three decisions interpreting commercially reasonable efforts obligations to cabin a buyer's discretion.  *See S'holder Rep. Servs. LLC v. Alexion Pharms., Inc.*, 2024 WL 4052343, at *15 (Del. Ch. Sep. 5, 2024) ("Alexion had sole discretion over ALXN1830, but its discretion was cabined by its promise to use commercially reasonable efforts to develop ALXN1830 into an approved anti-FcRn treatment."); *Neurvana*, 2020 WL 949917, at *1, *15 ("The asset purchase agreement gave Balt USA sole discretion post-closing on how to achieve the milestones, but it also obligated Balt USA to use

---

have almost unfettered discretion to allocate resources how they see fit according to the business needs of the company, and there is absolutely no obligation to prioritize the Embody products over anything else.").

commercially reasonable efforts in doing so."); *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *6 (Del. Ch. Dec. 28, 2018) ("[P]rovisions in the Merger Agreement gave Cephalon sole discretion to decide how to proceed with RSZ. That discretion, however, was cabined by the objective [commercially reasonable efforts] standard."), *aff'd*, 338 A.3d 1290 (Del. 2025) (TABLE). Although the contracts in those cases are not identical to the disputed language here,[9] they support Plaintiff's reasonable reading that New Embody's exercise of discretion is limited by its obligation to use commercially reasonable efforts to achieve the Milestones.

Accepting Plaintiff's reading of Section 2.10(h), however, the Amended Complaint nevertheless fails to adequately allege a breach of New Embody's commercially reasonable efforts obligation.

The Merger Agreement does not define "commercially reasonable efforts." Delaware courts have interpreted commercially reasonable efforts provisions as "plac[ing] an affirmative obligation on the parties to take all reasonable steps" to

---

[9] In *Neurvana* and *Himawan*, the relevant contract language explicitly stated that the buyer's exercise of discretion was "subject to" its commercially reasonable efforts obligation. In *Alexion*, however, the contract imposed a commercially reasonable efforts obligation, then stated: "Notwithstanding anything in this Agreement to the contrary, subsequent to the Closing, [the buyer] shall have sole discretion with regard to all matters relating to the operation of the Company, its Subsidiaries and their respective businesses . . . ." 2024 WL 4052343, at *14. Though the contract did not explicitly state that the buyer's discretion was "subject to" its commercially reasonable efforts obligation, the Court still read the two provisions together to mean the buyer's discretion was "cabined by its promise to use commercially reasonable efforts." *Id.* at *15.

21

achieve a particular end. *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017); *see, e.g.*, *Fortis Advisors LLC v. Johnson & Johnson*, 2024 WL 4048060, at \*24 (Del. Ch. Sep. 4, 2024) ("Delaware courts have interpreted 'commercially reasonable efforts' clauses as requiring a party 'to take all reasonable steps' toward an end." (citation omitted)), *rev'd in part and remanded on other grounds*, 352 A.3d 229 (Del. 2026). Beyond this, however, the Merger Agreement sheds no light on whether commercially reasonable efforts must be measured against the level of effort and resources typically used at Embody, Zimmer, other companies within the industry, or some other standard.[10]

By either an inward- or outward-facing standard, the allegations of the Amended Complaint fall short of alleging a breach of the commercially reasonable efforts provision. Plaintiff's allegations largely repackage his fraud theories, asserting that New Embody failed to use commercially reasonable efforts to achieve

---

[10] *Compare Alexion*, 2024 WL 4052343, at \*36 (describing "such efforts and resources typically used by biopharmaceutical companies similar in size and scope to [Alexion]" as an "outward facing" commercially reasonable efforts definition), *and Neurvana*, 2020 WL 949917, at \*16 (identifying a commercially reasonable efforts definition that "applie[d] an industry-standard requirement or looks to other participants in the industry" as an "outward facing definition"), *with Johnson & Johnson*, 2024 WL 4048060, at \*23–24 (interpreting "the expenditure of efforts and resources in connection with research and development . . . consistent with the usual practice of Parent and its Affiliates" as "an inward facing [commercially reasonable efforts] provision"), *and FMLS Hldg. Co. v. Integris BioServices, LLC*, 2023 WL 7297238, at \*7 (Del. Ch. Oct. 30, 2023) ("[T]he Commercially Reasonable Efforts Obligation is not external-facing, and instead, is based in part on the staffing and hiring practices at FlowMetric.").

the Milestones because it did not hire and retain a "commercially reasonable" number of experienced sales representatives. Am. Compl. ¶¶ 14, 132. Aside from New Embody's failure to hire the 94 new sales representatives that it allegedly promised through the Hiring Representation, Plaintiff does not allege or even attempt to explain why the number and experience of sales representatives that New Embody did employ was commercially unreasonable by any standard. Additionally, Plaintiff alleges that New Embody failed to use commercially reasonable efforts because it did not follow Plaintiff's plans as allegedly promised in the Development Representation, including by failing to improve the terms of employee incentive plans, decreasing the R&D budget compared to Embody's budget, and "shelving" certain "improvements" that Embody had planned for Tapestry RC. *Id.* ¶ 132. Other than alleging that New Embody failed to follow Embody's existing plans, Plaintiff does not allege or explain why New Embody's efforts were not commercially reasonable. The Amended Complaint makes no effort to "plead[] at least some facts tying [New Embody's conduct] to the 'relevant yardstick' supplied by the contractual commercially reasonable efforts provision," whatever Plaintiff believes that standard to be. *Neurvana*, 2020 WL 949917, at *17 (quoting *Himawan*, 2018 WL 6822708, at *8).

Many of Plaintiff's efforts allegations are conclusory. For instance, the Amended Complaint alleges that New Embody implemented a "new enterprise

23

resources planning" system that led to shipping delays for products, but other than identifying a negative outcome, it does not explain what was unreasonable about that system. Am. Compl. ¶ 116. The Amended Complaint also asserts that New Embody "fail[ed] to market the Embody [p]roducts in a commercially reasonable manner" and "fail[ed] to use distributors to sell the Embody [p]roducts in a commercially reasonable manner[,]" but does not allege facts supporting those conclusory allegations. *Id.* ¶ 132.

At oral argument, Plaintiff's counsel essentially conceded that New Embody's efforts fell within a range of commercially reasonable alternatives, pivoting to argue that "when given the choice between *different commercially reasonable options*, New Embody always selected the choice that would have resulted in just a little bit more delay, just a little bit more time so that they wouldn't have to pay earnouts to the [Plaintiff]." Tr. at 41:16–42:1 (emphasis added). According to Plaintiff, "[w]hile *each of* [*New Embody's*] *decisions . . .* [*were*] maybe [] a little bit *above the line of CRE*, when you look at the continuous and systematic pattern of decision-making . . . those decisions were all made with the intent of not paying a milestone." *Id.* at 42:2–7 (emphasis added). Choosing among different commercially reasonable options could not have breached the commercially reasonable efforts provision.

Finally, the Amended Complaint alleges that New Embody breached its obligation to use commercially reasonable efforts to achieve the Milestones because

24

studies and clinical trials did not progress according to Embody's plans. As Section 2.10(h) makes clear, nothing in the Merger Agreement "shall be construed to impose any express or implied obligation . . . to test . . . or otherwise advance any version of the Company Products." Agt. § 2.10(h). Even without this language, Plaintiff's allegations that New Embody breached its commercially reasonable efforts obligation by delaying or canceling clinical studies would fail. As alleged in the Amended Complaint, prior to the Merger, Embody "planned observational studies and data collection and clinical trials" for its products, including one study estimated to run from June 30, 2024 through June 30, 2028. Am. Compl. ¶¶ 40, 87–89. In November 2024, Zimmer put that study "on hold" while it "enhanced" Tapestry RC. *Id.* ¶ 89. The Amended Complaint fails to plead facts supporting an inference that New Embody acted in a commercially unreasonable manner by placing a study on hold to enhance the product. Nor can Plaintiff explain how delaying a study the parties always expected to conclude years after the earnout period ended supports an inference that New Embody failed to use commercially reasonable efforts to achieve the Milestones.

Similarly, the Amended Complaint alleges that prior to the Merger, Embody planned a second study that began in August 2023 but was suspended in December 2024 due to "[a]dministrative issues" with the Institutional Review Board. *Id.* ¶ 90. The Amended Complaint fails to allege any facts about the

suspension. Finally, the Amended Complaint also identifies two additional studies, one where the estimated completion date was pushed from February 2026 to March 2028, and another that is expected to end in August 2029. *Id.* ¶ 91. The Amended Complaint fails to allege facts about these purported delays and, in any event, Plaintiff again does not explain how delaying studies that were always expected to finish after the earnout period could support a breach of New Embody's obligation to use commercially reasonable efforts to achieve the Milestones.[11]

Because the Amended Complaint fails to adequately allege a breach of New Embody's commercially reasonable efforts obligation, the Second Cause of Action is dismissed.

## C. The Amended Complaint Fails To State A Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing.

The Third Cause of Action alleges that Defendants breached the implied covenant of good faith and fair dealing inherent in the Merger Agreement "by

---

[11] Relatedly, the Amended Complaint also seems to allege that New Embody failed to match the level of efforts that two competitors in the industry—Smith+Nephew and CONMED—have undertaken to conduct clinical trials. *See id.* ¶¶ 98–99, 102, 105–07. As alleged in the Amended Complaint, Smith+Nephew and CONMED rely on clinical data in their marketing materials, while Zimmer's website fails to cite any clinical data for New Embody. Importantly, however, the Amended Complaint does not allege that New Embody has clinical data to disclose. These allegations are nothing more than a reformulation of Plaintiff's theory that Defendants failed to follow Embody's plans for studies and trials.

26

arbitrarily and unreasonably exercising their discretion in a manner that prevented New Embody from achieving the Milestones." Am. Compl. ¶¶ 142–43.

"Under Delaware law, the implied covenant of good faith and fair dealing inheres in every contract." *Albertsons*, 2021 WL 2311455, at \*8 (quoting *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2009 WL 3756700, at \*4 (Del. Ch. Nov. 9, 2009)). The implied covenant "requires a 'party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at \*10 (Del. Ch. May 7, 2008) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE). Although the implied covenant is "occasionally described in broad terms," "a court cannot and should not use the implied covenant . . . to fill a gap in a contract with an implied term unless it is clear from the contract that the parties would have agreed to that term had they thought to negotiate the matter." *Id.* (quoting *Corp. Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at \*5 (Del. Ch. Apr. 10, 2008)). "[B]ecause the implied covenant is, by definition, *implied,* and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue." *Id.* (emphasis in original).

To state a claim for breach of the implied covenant of good faith and fair dealing, "a complaint 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" *Albertsons*, 2021 WL 2311455, at \*8 (quoting *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at \*11 (Del. Ch. May 29, 2020)).  Here, Plaintiff alleges that Defendants had an implied obligation not to arbitrarily and unreasonably exercise their discretion in a manner that prevented New Embody from achieving the Milestones, and breached this obligation by "(1) failing to employ an appropriate number[] of sales representatives to sell the Embody [p]roducts, (2) failing to timely advance the clinical data for the Embody [p]roducts, (3) failing to provide an adequate R&D budget for the Embody [p]roducts, and (4) delaying and then eventually implementing many of the recommendations made by [Plaintiff] in the early days after closing."  Am. Compl. ¶ 143.

Plaintiff's implied covenant claim fails because "the Merger Agreement fully occupies the space with respect to the buyer's post-closing operation of the business[,]" such that there is no gap for the implied covenant to fill. *Albertsons*, 2021 WL 2311455, at \*10.  As set forth above, Section 2.10(h) of the Merger Agreement gives New Embody the "right, in [its] sole discretion, to direct and control the production, marketing, promotion, sale and commercialization of the Company Product in all respects[,]" subject to its obligation to "use commercially

reasonable efforts to achieve the Milestones." Agt. § 2.10(h). If a "[m]erger [a]greement sets a contractual standard by which to evaluate if [the buyer's] failure to achieve and pay the earn-out payments . . . was improper[,]" there can be "no gap in the [m]erger [a]greement to fill in this regard." *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *5 (Del. Ch. Jan. 30, 2015). "[W]here the parties themselves bargain for limits on the buyer's discretion, as here, there is no gap for the implied covenant to fill." *Albertsons*, 2021 WL 2311455, at *9.[12]

To reach a different result, Plaintiff attempts to liken his allegations to the situation where a buyer "act[s] to delay accomplishment of the milestones so as to shift additional profits its way at the expense of the former . . . shareholders." AB at 36 (quoting *ev3, Inc. v. Lesh*, 114 A.3d 527, 541 (Del. 2014), *as revised* (Apr. 30, 2015)). Plaintiff asserts that "Defendant's actions and deliberate delays throughout the Milestone Period have made it impossible for . . . Net Sales requirements to be met within the contractually defined time frame." AB at 36.

---

[12] At oral argument, Plaintiff's counsel argued that because the Merger Agreement only imposes an obligation on New Embody to use commercially reasonable efforts to achieve the Milestones, the Merger Agreement leaves a gap to fill with respect to Zimmer. Tr. at 40:17–41:11 ("It is not duplicative of the contract claim, because there is no contract claim against Zimmer."). This argument also fails. Zimmer is a party to the Merger Agreement, under which the parties chose to impose an efforts obligation on New Embody only. The implied covenant cannot be used to rewrite the parties' agreement to impose obligations on Zimmer for which Plaintiff could have, but did not, bargain.

29

Putting his conclusory allegations aside,[13] Plaintiff identifies three ways in which Defendants allegedly acted to push earnings outside of the earnout period. First, the Amended Complaint alleges that New Embody delayed clinical trials, but as explained above, even accepting Plaintiff's allegations as true, the trials identified were never expected to conclude until after the earnout period. Am. Compl. ¶¶ 89, 116; *see supra* pp. 24–26. Second, the Amended Complaint alleges that New Embody "delay[ed]" hiring sales representatives during the earnout period but does not allege that New Embody hired additional representatives after the earnout period ended. Am. Compl. ¶ 77. And third, the Amended Complaint alleges that Zimmer delayed implementing Embody's "recommendations" until later in the earnout period, but it does not allege sufficient facts to support an inference that Zimmer did so with the intent to avoid the earnout. *Id.* ¶¶ 85, 119. This is yet another reformulation of Plaintiff's claim that Defendants should have followed Embody's plans, a commitment that Embody failed to secure in the Merger Agreement.

Importantly, the implied covenant may prohibit a buyer from intentionally harming the business in an effort to avoid an earnout payment, but it does not require a buyer "to do everything it c[an] to increase the earn-out payments." *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 638 (Del. Ch. 2011), *aff'd*, 76 A.3d 808 (Del. 2013).

---

[13] *See, e.g.*, Am. Compl. ¶¶ 2, 11, 15.

Yet that is essentially what Plaintiff argues by claiming that Defendants were required to employ more sales representatives, advance certain clinical trials, and better fund R&D. "[T]he implied covenant is not a license to rewrite contractual language just because the plaintiff failed to negotiate for protections that, in hindsight, would have made the contract a better deal." *Winshall*, 55 A.3d at 637.

The Merger Agreement sets a contractual standard to govern Defendants' obligations post-Merger. There is no gap to fill through the implied covenant of good faith and fair dealing. The Third Cause of Action is dismissed.

## III. CONCLUSION

For the reasons explained above, the Motion to Dismiss is granted in part and denied in part.

31